IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES and NATIVE ECOSYSTEMS COUNCIL, | Lead Case No. CV 19–92–M–DWM |
| Plaintiffs/Consolidated Plaintiffs, | Member Case No. CV 19–102–M–DWM |
| vs. | |
| LEANNE MARTEN, et al., | ORDER and OPINION |
| Defendants/Consolidated Defendants. | |

These consolidated cases concern the North Bridgers and Willow Creek

Projects, two insect and disease treatment programs proposed under the 2014

amendments to the Healthy Forest Restoration Act ("HFRA").  Plaintiffs Alliance

for the Wild Rockies and Native Ecosystems Council (collectively "Alliance")

allege the projects violate the National Environmental Policy Act ("NEPA") and

the Endangered Species Act ("ESA").  The parties' cross-motions for summary

judgment (Docs. 28, 31)[1] are suitable for decision on the briefs without a hearing.

L.R. 78.1.  For the following reasons, Alliance's motion is denied and Defendants'

motion is granted.

_____

[1] Unless otherwise noted, docket entries are from the Lead Case.

## BACKGROUND

The Agricultural Act of 2014, colloquially called the Farm Bill, amended HFRA "to allow the United States Forest Service greater flexibility in managing the health of forest lands threatened by insect and disease infestation." *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 777 (9th Cir. 2019); Pub. L. No. 113-79, § 8204, 128 Stat. 649, 915–18 (codified at 16 U.S.C. §§ 6591a, 6591b). Under the amendments, the Forest Service can designate "landscape-scale areas" that are threatened by insects or disease. § 6591a(b). Projects implemented on the designated areas to combat those threats are categorically excluded from NEPA provided they meet HFRA's statutory conditions. § 6591b.

The Forest Service designated 4,955,159 acres in Montana as threatened landscape under HFRA ("Threatened Landscape Designation"). WC 03656; NB 13844.[2] The North Bridgers and Willow Creek Projects are proposed insect and disease treatment programs on the Threatened Landscape Designation. WC 03656; NB 00004. The North Bridgers Project is in the Custer Gallatin National Forest, northeast of Bozeman. NB 00004. The Willow Creek Project is in the Helena-Lewis and Clark National Forest, southwest of Lincoln. WC 03656.

On June 3, 2019, Alliance filed suit challenging the North Bridgers Project,

---

[2] The Willow Creek Project record is cited as "WC [Bates #]." The North Bridgers Project record is cited as "NB [Bates #]."

2

alleging that Defendants violated NEPA by failing to analyze the Project's

cumulative effects (Claim 1), and by failing to analyze its effect on the adjacent

roadless area (Claim 2), and violated the ESA by failing to analyze the effects of

interrelated and interdependent HFRA projects on lynx (Claim 3). (Compl., Doc.

1; First Am. Compl., Doc. 20.) On June 14, 2019, Alliance filed suit challenging

the Willow Creek Project. (Compl., Member Case Doc. 1.) Similar to its North

Bridgers Project challenge, Alliance claims that Defendants violated NEPA by

failing to analyze the Willow Creek Project's cumulative effects (Count 1), and

violated the ESA by failing to analyze the effects of interrelated and

interdependent HFRA projects on grizzly bear, lynx, and lynx habitat (Count 6).

(Sec. Am. Compl., Member Case Doc. 23.) Alliance also challenges the Willow

Creek Project's qualification for the categorical exclusion (Count 2) and the lynx

and grizzly bear no jeopardy determinations for the 2018 Helena National Forest

Plan Amendments and the Willow Creek Project (Counts 3, 5), and further claims

that reinitiation of consultation for the 2016 Blackfoot Travel Plan is required

(Count 4). (*Id.*) The cases were consolidated on August 20, 2019. (Doc. 11.) The

parties subsequently filed cross motions for summary judgment. (Docs. 28, 31.)

## LEGAL STANDARD

NEPA and ESA claims are reviewed under the Administrative Procedure

Act ("APA"), which authorizes courts to "hold unlawful and set aside agency

3

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Because HFRA includes no private right of action, agency actions under HFRA are also reviewed under the APA. *See Native Ecosys. Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005). An action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is particularly applicable to judicial review of final agency action, where the issue is "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *City & Cty. of S.F. v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (internal quotation marks omitted).

4

## ANALYSIS

### I.     Threatened Landscape Designation

This Court previously determined that the Threatened Landscape

Designation was not a final agency action subject to NEPA review. *Native Ecosys.*

*Council v. Erickson*, 330 F. Supp. 3d 1218, 1234–35 (D. Mont. 2018); *Native*

*Ecosys. Council v. Marten*, No. 17-153-M-DWM, 2018 WL 6046472, at *4 (D.

Mont. Nov. 19, 2019) *aff'd*, 2020 WL 1685933, ___ F. App'x ___ (9th Cir. Apr. 7,

2020).  Alliance now argues that the Designation is nonetheless subject to the ESA.

(Doc. 29 at 9–11.)  This claim was not pled, (*see* Doc. 20; Member Case Doc. 23),

and therefore is not considered, *Stallcop v. Kaiser Found. Hosps.*, 820 F.2d 1044,

1050 n.5 (9th Cir. 1987) (refusing to consider claim raised for the first time in

summary judgment briefing).

### II.    Interrelated or interdependent actions

Section 7 of the ESA directs federal agencies to consult with the Fish and

Wildlife Service or National Marine Fisheries Service to ensure that their actions

are "not likely to jeopardize the continued existence of any endangered species or

threatened species" or cause the "destruction or adverse modification" of critical

habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b).  Before consulting,

agencies prepare biological assessments to evaluate an action's effects on protected

species and habitat.  50 C.F.R. § 402.02.  When the North Bridgers and Willow

Creek Projects were approved, an action's "effects" included "the direct and

indirect effects of an action on the species or critical habitat, together with the

effects of other activities that are interrelated or interdependent with that action,

that will be added to the environmental baseline." 50 C.F.R. § 402.02 (2016).[3] In

its biological assessments, the Forest Service concluded that the North Bridgers

Project was not likely to adversely affect Canada lynx, NB 07852, and that the

Willow Creek Project was not likely to adversely affect Canada lynx or its critical

habitat but was likely to adversely affect grizzly bear, WC 03785, 03790, 03800.[4]

Alliance challenges those determinations, arguing that the Projects are "interrelated

or interdependent" actions that should have been analyzed together.

Defendants contend that Alliance failed to raise this claim in its 60-day

notices of its intent to sue. Plaintiffs must provide written notice to the agency at

least 60 days before filing an ESA claim in federal court. 16 U.S.C. § 1540(g)(2).

The notice must provide enough information for the agency to identify and attempt

to address the claim, but it need not "list every specific aspect or detail of every

---

[3] The definition of "effects" was amended effective October 28, 2019. 84 Fed.
Reg. 44976, 45016 (Aug. 27, 2019); 84 Fed. Reg. 50333, 50333 (Sept. 25, 2019).
The new definition dispenses with the language about "interrelated or
interdependent" activities in favor of "the consequences of other activities that are
caused by the proposed action." 50 C.F.R. § 402.02 (2020).
[4] The Fish and Wildlife Service concurred, and further determined that the Willow
Creek Project's adverse effects to grizzly bear were authorized under an existing
programmatic incidental take statement. NB 07873–74; WC 03695–700.

alleged violation." *Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d

645, 651 (9th Cir. 2015). (internal quotation marks omitted). The requirement is

jurisdictional. *Id.* at 647.

Alliance's notice on the North Bridgers Project satisfied this standard by

explicitly raising the failure to analyze other HFRA projects' effects on lynx:

> [T]he Biological Assessment fails to address the effects of interrelated
> actions on lynx including the direct and indirect effects of the North
> Bridger[s] Project with the effect of other projects that have been
> categorically excluded from NEPA through the use of the Healthy
> Forest Restoration Act or other categorical exclusions.

NB 13402. However, Alliance's notice on the Willow Creek Project is

insufficient. It states that the biological assessment "fails to adequately address

cumulative effects" of the Project on lynx, lynx habitat, and grizzly bear, but does

not reference other projects or use the terms interrelated or independent.

WC 31211–12. "Cumulative effects" are defined as "those effects of future State

or private activities, *not involving Federal activities*, that are reasonably certain to

occur within the action area of the Federal action subject to consultation." 50

C.F.R. § 402.02 (emphasis added). This definition does not encompass other

HFRA projects. Further, cumulative effects are distinct from interrelated or

independent actions. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,

698 F.3d 1101, 1113 (9th Cir. 2012). The notice, then, does not merely lack

specific details but completely omits the crux of Alliance's challenge.

7

Accordingly, Alliance's claim that the Willow Creek biological assessment failed to analyze interdependent or interrelated actions, as pled in Count 6 of the Member Case, is dismissed. (Member Case Doc. 23 at ¶¶ 131–36.) However, the Court has jurisdiction over the claim with respect to the North Bridgers Project, as pled in Claim 3 of the Lead Case. (Doc. 20 at ¶¶ 94–103.)

Defendants argue that this claim is nonetheless waived because Alliance failed to raise it in comments on the North Bridgers Project. Defendants do not point to a statutory requirement to raise prospective claims during the comment period. Rather, they cite the general administrative exhaustion requirement for claims against the Department of Agriculture:

> Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against--
> (1) the Secretary;
> (2) the Department; or
> (3) an agency, office, officer, or employee of the Department.

7 U.S.C. § 6912(e). This provision was previously interpreted as requiring plaintiffs to exhaust the Forest Service's appeals process set forth in 36 C.F.R. part 215. *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 847 (9th Cir. 2013). However, that appeals process has since been repealed. 79 Fed. Reg. 44291 (July 31, 2014). It is unclear, then, what application § 6912(e) has to this case. Nonetheless, the requirement for plaintiffs to raise their objections with the

8

agency is a general principle of administrative law. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65 (2004). Alliance complied with that principle by filing its 60-day notices of intent. Accordingly, Alliance's claim that the Forest Service failed to consider interrelated or interdependent actions in the North Bridgers biological assessment is properly before the Court. It fails on the merits.

Under the applicable version of the regulations, "[i]nterrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration." 50 C.F.R. § 402.02 (2016). "The test for interrelatedness or interdependentness is 'but for' causation: but for the *federal* project, these activities would not occur." *Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1225 (9th Cir. 2015) (internal quotation marks omitted). That test is not met here. The Threatened Landscape Designation is not a but for cause of the North Bridgers Project. As the first step in obtaining a categorical exclusion, the Designation makes it easier to approve HFRA projects. But there is nothing to suggest that the Project would not have been approved absent HFRA's expedited procedures; it would just have gone through the lengthier NEPA process. Further, the North Bridgers and Willow Creek Projects are not but for causes of each other. They are in different national forests, where they were approved by different Forest Service officers. *Compare* WC 03654–94 *with* NB 00001–67.

9

Alliance's reliance on *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), and

*Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010), is misplaced.

Those opinions address the scope of an agency's analysis. *Conner* held that

analyzing only the leasing stage of oil and gas exploration, rather than the

exploration activities, was arbitrary and capricious. 848 F.2d at 1452–54. It did

not discuss interrelated or interdependent actions. *Wild Fish Conservancy* rejected

the choice to analyze a salmon hatchery in five-year increments instead of over the

life of the hatchery. 628 F.3d at 523–24. The opinion later concluded that the

agency adequately analyzed the disposal of fish food waste as an interrelated

action, *id.* at 529–30, but that is not the part of the opinion that Alliance cites, (*see*

Doc. 35 at 12–14), and in any event the fishery was a "but for" cause of the waste

disposal, unlike the actions in this case.

## III. Effects on roadless areas

The North Bridgers Project and the Willow Creek Project are both adjacent

to roadless areas. NB 00022–23; WC 03671. Alliance argues that the Forest

Service violated NEPA by failing to consider the Projects' effects on the roadless

areas before applying the HFRA categorical exclusion. However, Alliance did not

plead this challenge to the Willow Creek Project. (*See* Member Case Doc. 23.)

Therefore, the issue is only considered with respect to the North Bridgers Project,

as pled in Claim 2 of the Lead Case. (*See* Doc. 20 at ¶¶ 90–93.)

Alliance argues that the Forest Service failed to make a significance determination or conduct extraordinary circumstances review under 40 C.F.R. § 1508.4. (Doc. 29 at 23–30.) But the requirements for applying a regulatory categorical exclusion under § 1508.4 do not apply to HFRA projects. *Native Ecosys. Council*, CV 17-153-M-DWM, 2018 WL 6046472, at \*4–5. Rather, HFRA categorical exclusions are governed exclusively by 16 U.S.C. § 6591b. *Id.* Alliance's challenge therefore fails. Alliance also argues that the analysis of the adjacent roadless area violated HFRA's scoping provisions. (Doc. 29 at 30; Doc. 35 at 20–22.) The challenge involving the roadless area was brought under NEPA. (Doc. 20 at ¶¶ 90–93.) The newly raised HFRA claim is disregarded.

## IV. Willow Creek Project's eligibility for categorical exclusion

Count 2 of the Member Case alleges that the Willow Creek Project does not meet three of the statutory requirements for the categorical exclusion under HFRA. However, the Project complies with the first two requirements that Alliance raises, and Alliance has waived its challenge to the third.

First, Alliance argues that the Willow Creek Project does not comply with the requirements that no new permanent roads be established and that temporary roads be decommissioned within three years. § 6591b(c)(3). This is belied by the record. *See* WC 03713–14. The Project calls for the construction or reconstruction of 6.8 miles of temporary road. WC 03713. The record explicitly addresses when

11

and how the temporary roads will be decommissioned:

> The Farm Bill CE authority requires obliteration of temporary roads within three years of project completion. However, to minimize the potential effects upon grizzly bears, temporary roads will be obliterated within three years of construction as addressed in the draft Northern Continental Divide Ecosystem (NCDE) Grizzly Bear Conservation Strategy. Road obliteration includes installing drain dips, outsloping, scarifying, and recontouring. To address other resource concerns portions of the obliterated roadbeds may be covered with litter, duff, and slash and seeded.

WC 03714; *see also* WC 03683 (explaining the steps to obliterate temporary roads). Alliance ignores these express measures, focusing instead on this Court's previous determination that the Forest Service's road closure methods in the Kootenai National Forest were ineffective. *See Alliance for the Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1198–1205 (D. Mont. 2019). But *Probert* dealt with documented historic road closures. Here, Alliance speculates that the Willow Creek Project's temporary roads will not be effectively obliterated in the future. Alliance's position is untenable as it would render all projects ineligible for HFRA's categorical exclusion based on the mere possibility that planned road closures will be ineffective.

Second, Alliance contends that the Willow Creek Project does not maximize retention of old-growth and large trees, challenging the Forest Service's failure to specify a minimum diameter for "large" trees. Defendants respond that a qualitative analysis was sufficient. WC 27592–93. The statutory language

12

requires forest health projects to "maximize[] the retention of old-growth and large trees, as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease." §§ 6591a(e), 6591b(b)(1)(A). This language vests the Forest Service with considerable discretion to weigh various factors, including the characteristics of the project area and the risk of insects and disease, when identifying old-growth and large trees. Contrary to Alliance's view, nothing in the statute demands a quantitative approach and the Forest Service's qualitative analysis was not arbitrary and capricious.

Finally, Alliance argues that the Willow Creek Project does not comply with the requirement for projects to be located in either "the wildland-urban interface" or in "Condition Classes 2 or 3 in Fire Regime Groups I, II, or III." § 6591b(c)(2). The Project falls mostly within the Tri-County Regional Community Wildfire Protection Plan wildland-urban interface, with some of the Project area in the fire regime condition class two areas. (Ex. 1, Doc. 32-1 at 2–3, 7.)[5] Alliance contends that the Tri-County region, while nominally a wildland-urban "interface" community, is actually an "intermix" community.

---

[5] This document is a declaration by William Schroeder of the Forest Service and a map of the Willow Creek Project area generated from a GIS database. While the underlying data is in the record, it requires specialized geospatial software to view. (Doc. 32 at 28.) The declaration and map are considered under the extra-record exception for "when supplementing the record is necessary to explain technical terms or complex subject matter." *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (internal quotation marks omitted).

However, as Defendants argue, Alliance waived this claim by failing to raise it during the public comment period on the Willow Creek Project. *See Pub. Citizen*, 541 U.S. at 764–65. Alliance's comments on the wildland-urban interface are limited to the Project's effect on lynx and the need for a map showing land ownership within the relevant wildland-urban interface. *See* WC 04446, 04462, 04507–08. Nowhere does Alliance question whether the Tri-County Regional Community Wildfire Protection Plan wildland-urban interface meets HFRA's statutory requirements. That challenge is waived.

In any event, it fails on the merits. HFRA defines a "wildland-urban interface" as "an area within or adjacent to an at-risk community that is identified in recommendations to the Secretary in a community wildfire protection plan." 16 U.S.C. § 6511(16)(A). An "at-risk community" is further defined as

> an area . . . that is comprised of . . . an interface community as defined in the notice entitled 'Wildland Urban Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire' issued by the Secretary of Agriculture and the Secretary of the Interior in accordance with [T]itle IV of the Department of the Interior and Related Agencies Appropriations Act, 2001 (114 Stat. 1009) (66 Fed. Reg. 753, January 4, 2001).

§ 6511(1). The cited Federal Register notice, in turn, explains that three types of communities—interface, intermix, and occluded—qualify as "urban wildland interface" communities. 66 Fed. Reg. 751, 753 (Jan. 4, 2001). Contrary to Alliance's contention, the Tri-County Regional Community's status as an

14

"intermix" community would not preclude application of the categorical exclusion to the Willow Creek Project.

**V.    Helena National Forest Plan Amendments and Blackfoot Travel Plan**

The Willow Creek Project is tiered to the programmatic Blackfoot Travel Plan, which was incorporated into the Helena National Forest Plan in 2016 to govern motorized access to the Helena National Forest.  WC 03667; WC 03130–297.  The Helena National Forest Plan was amended in 2018 with new standards for grizzly bear habitat.  The administrative record does not include information about the 2018 Amendments.  (*See* Doc. 29 at 36 (citing an internet source).)

As alleged in Count 3 of the Member Case, Alliance challenges the Fish and Wildlife Service's determination that the 2018 Amendments pose no jeopardy to grizzly bear.  (*Id.* at 39–41.)  Alliance further contends that the effects of the 2018 Amendments were not analyzed in the Willow Creek biological assessment.  (*Id.* at 40.)  As alleged in Count 4 of the Member Case, Alliance argues that reinitiation of consultation on the Blackfoot Travel Plan is necessary under the ESA in light of the 2018 Amendments.  Alliance's ESA challenges to the 2018 Amendments and the Blackfoot Travel Plan are tangential to the Willow Creek Project, at best.  In any event, they were not raised in Alliance's 60-day notice of intent to sue, *see* WC 31209–12, and are dismissed for lack of subject matter jurisdiction, *Klamath-Siskiyou Wildlands Ctr.*, 797 F.3d at 647.

15

## VI.  Unbriefed claims

Claim One of the Lead Case and Count 1 of the Member Case allege that the

Forest Service violated NEPA by failing to analyze the North Bridgers and Willow

Creek Projects' cumulative effects before applying the categorical exclusion.

(Doc. 20 at ¶¶ 81–89; Member Case Doc. 23 at ¶¶ 81–89.)  Count 5 of the Member

Case alleges the determinations that the Willow Creek Project would not adversely

affect lynx and that the 2018 Helena Amendments posed no jeopardy to the lynx

are arbitrary and capricious.  (Member Case Doc. 23 at ¶¶ 125–30.)  Because those

claims have not been argued, they are dismissed. *See Mont. Envtl. Info. Ctr. v.*

*U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074, 1105 (D. Mont. 2017)

(dismissing claims plaintiffs failed to argue at summary judgment).

### CONCLUSION

IT IS ORDERED that Claim One of the Lead Case and Counts 1 and 5 of

the Member Case are DISMISSED because Alliance failed to address them at

summary judgment.

IT IS FURTHER ORDERED that Counts 3, 4, and 6 of the Member Case

are DISMISSED for lack of subject matter jurisdiction because Alliance failed to

raise them in its 60-Day notices of intent to sue.

IT IS FURTHER ORDERED that summary judgment is GRANTED for

Defendants on Claims Two and Three of the Lead Case and Count 2 of the

16

Member Case.  The Clerk of Court is directed to enter judgment consistent with this Order and close the case.

IT IS FURTHER ORDERED that the hearing set for June 25, 2020, is VACATED.

DATED this 3rd day of June, 2020.

15:00 P.M.

Donald W. Molloy, District Judge
United States District Court

17